[No. A020624. First Dist., Div. One. Nov. 8, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ANGELO CRENSHAW, Defendant and Appellant.

**COUNSEL**

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, and Julia Cline Newcomb, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ronald E. Niver and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ELKINGTON, J.**—Defendant Crenshaw was found guilty by a Contra Costa County jury's verdicts of (count I) murder in the perpetration of which he used a firearm, and (count II) possession of a sawed-off shotgun. He appeals from the judgment which was entered upon the jury's verdicts and finding.

We state the material evidence, as it is found to be accurately related in the probation officer's report to the trial court.

"At approximately 11:00 on the evening of March 20, 1982 the 21-year-old victim, Richard Aguilera, was driving his car through an unincorporated area of North Richmond. Debbie Gonzalez and Robert Maes were passengers in the vehicle.

"As Aguilera turned onto Grove from 5th Street, he was approached by a group of black males who offered to sell him small bags of marijuana for five dollars. Aguilera stated that he was not interested in marijuana but asked if they had any Sherman (PCP cigarettes) available. One of the men, Laython Godfrey, stated that he did. Aguilera asked to see what he had but Godfrey, fearing that Aguilera might attempt to steal the item, declined to

let him see it unless he got out of his car. Aguilera offered to turn his engine off but Godfrey persisted in demanding that he get out of the car. Aguilera finally acceded and got out, examining Godfrey's single Sherman cigarette wrapped in tin foil. While he was doing so, some sort of argument developed and Godfrey, apparently believing that he was up to some sort of mischief, began hitting him. Other members of the group apparently tried to get Ms. Gonzalez to get out of the car but she refused until she learned that Aguilera was being attacked. She and Maes then got out and went to his assistance, Ms. Gonzalez throwing a tequila bottle at the group of attackers.

"Finally, Aguilera, Ms. Gonzalez and Maes were able to get back into their car. However, before they could leave, one of the attackers reached through the window and attempted to grab the victim's car keys but Ms. Gonzalez managed to snatch them away. As she did so, she saw a 'big fat black guy' (later identified as the defendant) approach the car and shoot Aguilera behind his left ear, killing him, before fleeing.

"Information provided by witnesses identified the defendant as a suspect. Officers went to the residence of his mother and took him into custody at approximately 8:00 on the morning of March 21. He subsequently signed a consent to search his room and, at approximately 10:00 that morning, officers went to the residence of his mother, showed her the consent, and searched the bedroom. They found an Iver Johnson target model .22 caliber revolver in a black leather holster inside a box on the floor of the defendant's closet. The cylinder had been removed from the weapon, but a cylinder pin was found in the box. Another box contained the cylinder and seven .22 caliber bullets in a zip-lock bag. A Harrington-Richardson .12 gauge sawed-off shotgun was found between the mattresses of the defendant's bed, along with a four x five rifle scope. An expended .22 caliber casing was found next to the head of the bed and clothing, described by witnesses as having been worn by the defendant at the time of the shooting, was found in his room. The defendant had previously told the officers that he did not own or possess any gun and that he knew of none being present at this residence.

"Later that same morning the defendant voluntarily submitted to a polygraph examination. Three separate charts showed that he was being untruthful when asked, 'Did you shoot that man on 5th and Grove last night?' At this point, the defendant declined to discuss the case further without counsel being present.

"Ballistics tests revealed that the bullet removed from the victim's brain was too severely damaged to positively prove that it had been fired from

the gun found in the defendant's bedroom. However markings found on it were consistent with those produced by test firings of the gun and in no way eliminated it as the murder weapon. A ballistics expert determined that the casing found in the defendant's bedroom had, in fact, been fired from the gun. Although no usable fingerprints were found on the weapon or on the shotgun, two palm prints recovered from the driver's side door of the victim's car were identified as those of the defendant.''

Crenshaw makes no contention that the evidence of his guilt adduced at trial was not substantially supportive of the jury's verdicts. Instead, he states his principal argument in this manner:

"The judgment must be reversed because appellant was denied his fundamental right, guaranteed by the federal Constitution, to be tried by a jury drawn from the vicinage of the offense."

Although not expressly so stated, it appears that Crenshaw may be arguing *Buford* (*People* v. *Buford* (1982) 132 Cal.App.3d 288 [182 Cal.Rptr. 904]) error. *Buford,* as is becoming increasingly well known, calls upon the counties of this state to redouble their efforts "to achieve the constitutional goal," that the proportion of blacks called for jury service bear a reasonable relation to their contribution to each county's total population. In contrast to *Buford's* demands, Crenshaw limits his argument to the contention, "that he was denied his right to be tried by a jury selected from *the vicinage of the offense,* an integral part of the right to jury trial guaranteed by the Sixth Amendment to the United States Constitution." (Our italics.)

■ The argument may even be additionally narrowed, as insisting that Crenshaw's crimes having been committed in the City of Richmond area in Contra Costa County, it was constitutionally mandated that his jury be drawn principally, if not entirely, from that city's environs. And if such a selection be found impracticable, he says, "no major impediment exists to prevent Contra Costa County" from trying such felonies, as are committed in or nearby the City of Richmond, in the area of their commission.

The several arguments are grounded on the Sixth Amendment (applicable to the states through the Fourteenth Amendment (see *People* v. *Jones* (1973) 9 Cal.3d 546, 549 [108 Cal.Rptr. 345, 510 P.2d 705])), which, as here relevant, provides: " 'In all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury of the *State and district wherein the crime shall have been committed,* which district shall have been previously ascertained by law, . . .' " (Our italics.)

■ The Sixth Amendment's rights in respect of jury trials are simply those as had existed, at the time of their adoption, at the *common law.*

(*People* v. *Collins* (1976) 17 Cal.3d 687, 692 [131 Cal.Rptr. 782, 552 P.2d 742].) Under the common law, the jury were summoned "from the *vicinage where the crime is supposed to have been committed.*" (*People* v. *Martin* (1922) 188 Cal. 281, 286 [205 P. 121, 21 A.L.R. 1399].) And at common law the term *vicinage* was "interpreted to be of the county where the [crime] is committed." (*People* v. *Powell* (1891) 87 Cal. 348, 358 [25 P. 481].) The same meaning will ordinarily be given the term today. (*People* v. *Powell, supra,* at pp. 358-359; *People* v. *Amor* (1975) 12 Cal.3d 20, 31 [114 Cal.Rptr. 765, 523 P.2d 1173]; *People* v. *Richardson* (1934) 138 Cal.App. 404, 408, 409 [32 P.2d 433]; *Matter of MacDonald* (1912) 20 Cal.App. 641, 642 [129 P. 957].)

Thus, although the counties of the several states are, with apparent universality, treated as the proper venue and source of jurors for felony trials, respect will nevertheless be shown the legislative creation of *judicial districts.* (See *United States* v. *Johnson* (1944) 323 U.S. 273, 274 [89 L.Ed. 236, 238, 65 S.Ct. 249]; *In re Mana* (1918) 178 Cal. 213, 214 [172 P. 986].) For it will be remembered that the Sixth Amendment, while first requiring trial by an impartial jury of the "district wherein the crime shall have been committed," continues, saying *"which district shall have been previously ascertained by law."* And while jurors are ordinarily drawn from judicial districts coterminous with counties on felony cases, the legislatively determined boundaries of a "judicial district," or "jurisdictional territory," seemingly prevail. Accordingly, congressional determination of federal judicial districts (often many counties), and legislatively fixed municipal and justice court districts (with less than countywide boundaries) will be the sources of trial jury selection.

As said in *United States* v. *Katz* (D.Pa. 1948) 78 F.Supp. 21, 23-24: " '[T]he term "vicinage," while subject to various definitions depending on the sense in which it is used, has been held to refer to an area corresponding with the territorial jurisdiction of the court in which trial is had.' "

We have, of course, considered the case of *People* v. *Jones, supra,* 9 Cal.3d 546, upon which Crenshaw principally relies, and which concerned the Los Angeles County Superior Court jury selection procedures. By legislative enactment, the superior court of that county had been divided into several judicial districts, including the Central, and Southwest. County authorities had developed a practice of trying cases of crime committed in the Central District, before jurors drawn entirely from the Southwest District. The result was a systematic exclusion of jurors from the Central District on criminal cases there arising, and thus a Sixth Amendment violation. ▬ Here no *systematic exclusion* of jurors from any part of Contra Costa County was established.

For these several reasons no merit is discerned in Crenshaw's instant contention.

Another contention of Crenshaw's appellate briefs is stated as: "The court abused its discretion by applying the wrong standard to appellant's jury challenge." It is of *Wheeler* (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748])-*Buford* (*People* v. *Buford, supra,* 132 Cal.App.3d 288) error. The contention's claimed "wrong standard" is based upon the trial court's stated determination: "The court does find that the county is doing all that can reasonably be expected to achieve the constitutional goals mandated in *Wheeler.*"

We do not perceive the application of a standard other than that required by *Wheeler* and *Buford.* And the trial court's factual determination appears to be supported by the record; no contrary argument is made.

Crenshaw's appeal's final argument is that: "The trial court's denial of appellant's request for the appointment of a demographer to assist in his jury challenge constituted an abuse of discretion."

As conceded by him, "the decision to appoint an expert is a matter for the trial court's discretion." No abuse of that discretion appears from our examination of the record.

The judgment is affirmed.

Racanelli, P. J., and Holmdahl, J., concurred.

A petition for a rehearing was denied December 7, 1984, and the opinion was modified to read as printed above. Racanelli, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied January 31, 1985. Bird, C. J., and Broussard, J., were of the opinion that the petition should be granted.