[No. A084426. First Dist., Div. Five. Jan. 30, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
ALDRIDGE CURRIE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.B. through II.G.

**COUNSEL**

C. Elliot Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STEVENS, J.**—Appellant Aldridge Currie was convicted after a jury trial of second degree murder, attempted robbery, and unlawful possession of a firearm by a felon. (Pen. Code, §§ 187, 664, 211-212.5, subd. (c), 12021,

subd. (a)(1).)[1] The jury also found true two special circumstance allegations that appellant had used a firearm in the commission of the crimes of murder and attempted robbery. (§ 12022.5, subd. (a).) In bifurcated proceedings tried to the court, two prior prison term allegations were also found true. (§ 667.5, subd. (b).)

Appellant's principal contention on appeal revisits a topic that has historically been the object of numerous challenges, namely, the composition of jury venires in Contra Costa County. He contends the trial court erred in denying his motion to quash the master jury list and jury venire, on the grounds that his rights under the Sixth Amendment to the United States Constitution, and article I, section 16, of the California Constitution, to trial by an impartial jury drawn from a representative cross-section of the community were denied.

We conclude, however, that appellant failed to establish a prima facie case of systematic exclusion of African-American jurors in the jury selection process, and that his other claims are without merit.

We affirm the judgment of conviction.

I. FACTS AND PROCEDURAL HISTORY

Appellant admitted in his testimony at trial that he shot the murder victim, Santos Maldonado, after the two had an argument. It was appellant's position that he acted in self-defense. On the other hand, the prosecution argued that appellant shot Maldonado while attempting to rob the victim of his drugs and money.

Maldonado was a drug dealer in the City of Pittsburg, who sold drugs with his girlfriend Ami Jurica. Maldonado and Jurica both were acquainted with appellant, whom they knew as "R.G."

On the evening of July 12, 1995, Jurica and Maldonado were in the latter's car, selling drugs in front of the house of an acquaintance, Jerry Silva, on Eighth Street in the City of Pittsburg. Around 8:00 p.m., appellant waved at them, approached, and began talking to Maldonado. The two men soon started arguing about the ownership of a .357-caliber handgun that Maldonado possessed. Appellant claimed the gun was his, and that he had loaned it to their mutual acquaintance Silva, who had in turn loaned it to Maldonado. Appellant now wanted it back. However, Maldonado claimed to have purchased the gun from Silva. Inasmuch as Silva lived in the house in front of which Maldonado had parked his car, the two men went inside to see Silva and resolve their dispute.

---

[1]Unless otherwise indicated, all further section references are to the Penal Code.

When Maldonado and appellant returned to the parked car, John Marshall, who had approached Maldonado to buy a gram of methamphetamine for $20, momentarily interrupted the two men. After purchasing drugs, Marshall asked Maldonado if he was "packing" a gun. Maldonado, who was seated in his car, pulled out a .38-caliber handgun and showed it to Marshall and then placed the gun on the car seat.

As Marshall was speaking with Maldonado, appellant asked the latter how much "crank" (methamphetamine) he would sell for a "C note" ($100). Maldonado replied he would sell appellant an "eight ball" weighing three and one-half grams. Stating that he had money nearby and would be right back, appellant left. Meanwhile, Maldonado and Jurica waited in the vehicle for appellant to return with the money.

About 10 minutes later appellant returned, not with money but with a gun. He approached the driver's side of the car where Maldonado was seated, and shot Maldonado in the neck. Jurica had been listening to music and did not see appellant return to the vicinity of the vehicle. Suddenly she heard the discharge of a gun. Jurica turned to see Maldonado slumped and immobile and, at the same time, appellant standing outside the car, holding a gun and looking "angry and shaky." Next, appellant tore off Maldonado's gold chain, and rifled his clothing for drugs and money, yelling that he wanted the dope and money. Jurica handed appellant $40 in currency. Appellant started to flee, but then turned and pointed the gun at Jurica. She ducked down in the car, but no other shots were fired.

Jurica drove away from the scene of the shooting in the victim's car. Reaching a pay phone at a nearby Jack-in-the-Box fast-food restaurant, she dialed 911 and hailed down a passing police car. Pittsburg Police Officers David Zuniga and Robert Dupont responded and found Jurica covered with blood, crying, screaming, and hysterical. Maldonado was unconscious with a gunshot wound to the left side of the neck; he was "gasping for air" and "gurgling" blood. He was taken to the hospital, where he was soon pronounced dead as a result of loss of blood and blood filling his lungs. Jurica told the police that appellant was the shooter, and she gave them his description, which was broadcast to other police units. Jurica however was not at first truthful in telling the authorities all of the circumstances surrounding the shooting, including her involvement with Maldonado in drug sales, but she did so later, after learning of his death.

Meanwhile, appellant had escaped to a nearby house that was occupied by a fellow drug user, Phillip Drake. Drake and his friend, ex-felon Wendy Nguyen, were both inside the Drake residence when appellant arrived.

Appellant knocked on the door and demanded immediate admittance; he was carrying two guns, and was acting "real rushed." Appellant said he had just robbed and shot Maldonado "in the neck" and that his victim would not be criticizing him any more. Then, appellant went into a closet to take a "hit" i.e., do some drugs.

Later that evening, shortly before midnight, Officers Bruce Brown and Kirby McNesby, who had earlier heard a broadcast of the suspect's description over police radio, spotted appellant near an apartment complex on Tenth Street. As appellant turned to walk into the complex, Officers Brown and McNesby parked their patrol vehicle and followed him, splitting up to cover both sides of the complex. Brown next spotted appellant as he was kneeling down near the east side of the complex. At gunpoint, Brown ordered him to stop and put his hands up, but appellant walked away to the other side of the complex in the direction taken by McNesby. McNesby took appellant into custody. Appellant was searched, and his pants pocket contained $90, in denominations of two twenties, two tens, and thirty ones. Moments later, Brown recovered a handgun in a utility box for the apartment complex, about 25 feet from the location where he first saw appellant inside the apartment complex. There was blood on the barrel of the weapon, with five rounds and one expended cartridge in the cylinder. Forensic testing showed the recovered weapon was consistent with the gun that fired the bullet removed from the victim's body, although a positive match could not be made.

Appellant was charged with Maldonado's murder; the robberies of Maldonado and Jurica; being a felon in possession of a firearm; the special circumstance allegation of robbery; two allegations of firearm use; and two enhancements of prison term priors. The People sought the death penalty.

Appellant brought a motion to quash the master jury list and jury venire, contending that African-American jurors were underrepresented on the lists of potential jurors in Contra Costa County. The trial court ultimately denied appellant's motion, ruling that he failed to make out a prima facie case that African-Americans are unconstitutionally excluded from Contra Costa County Superior Court venires. We discuss this issue and the facts relating to it in part II.A. of this opinion.

The matter proceeded to jury trial, and the prosecution adduced the evidence summarized above. Appellant presented evidence which tended to undercut the credibility of Jurica, based upon her involvement in various criminal activities, conflicting statements given to the police in an apparent effort to escape prosecution on drug charges, and a grant of immunity received in exchange for her testimony.

Appellant also introduced latent prints lifted from the inside of the victim's car, which did not match appellant's fingerprints, as well as the testimony of a longtime acquaintance, Robert Reeder. Reeder offered that appellant visited him at his apartment on the night of appellant's arrest, and that he did not see him in possession of a gun. Reeder at first indicated appellant had been with him for hours, suggesting a possible alibi, but later testified appellant had only been with him a few minutes. Reeder acknowledged that the two men had been incarcerated in jail together after the shooting, but denied ever having discussed appellant's case.

Appellant also testified. He acknowledged being a convicted felon, and that he shot Maldonado. However, he claimed to have done so in self-defense after the victim, whom he believed to be high on drugs, pulled a gun on him during an argument the two men were having over a gun appellant had loaned Silva. Appellant denied robbing or taking any property from either Maldonado or Jurica. It was only after Maldonado pulled out a gun and ordered, "get the fuck away from my car," that he shot Maldonado, allegedly in self-defense. Appellant's testimony confirmed portions of evidence presented by the prosecution, such as his shooting of the victim, his flight to Drake's house, his subsequent use of crack cocaine, and his hiding of the gun used in the shooting inside the utility box. Appellant also admitted lying to the police, telling them he knew nothing about the shooting, because he did not trust the police and was scared and high on drugs.

Evidence was also presented of the presence of methamphetamine, amphetamine, and alcohol in the victim's blood. According to a defense medical expert, Dr. David Smith, the level of methamphetamine in Maldonado's blood was consistent with chronic abuse, and he would expect such a person to exhibit symptoms of paranoia, impaired impulse control, and delusional thinking. Given the levels of alcohol and methamphetamine in the victim's blood, and the hostile threatening environment that presented itself to the victim, Dr. Smith hypothesized that Maldonado could have experienced a "rage reaction," which would cause him to aggressively respond to a perceived threat.

The jury convicted appellant of second degree murder (count 1), the attempted robbery of Maldonado (a lesser included offense of count 2), and unlawful possession of a firearm by a felon (count 4). (§§ 187, 664, 211-212.5, subd. (c), 12021, subd. (a)(1).) The two special allegations charging personal use of a firearm as to counts 1 and 2 were also found to be true. (§ 12022.5, subd. (a).) Appellant was acquitted on the charge of robbery as to Jurica (count 3). In a bifurcated proceeding tried to the court, the two prison term priors were found to be true. (§ 667.5, subd. (b).) Appellant

received an aggregate determinate term of nine years eight months in state prison, and a consecutive indeterminate term of 25 years to life for the murder and two firearm use allegations.

## II. Discussion

### A. *Challenge to the Jury Venire Panel*

Our resolution of appellant's claim that he made out a prima facie case showing African-American jurors were underrepresented on Contra Costa County Superior Court venires, and that such underrepresentation resulted from systematic exclusion, is a mixed question of law and fact. It requires that we apply de novo review to all legal issues, while accepting any factual findings of the trial court, if they are supported by substantial evidence. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1154 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

█ We first review the applicable legal principles, before turning to the merits. The Sixth Amendment right to a jury trial encompasses the right to trial by an impartial jury drawn from a representative cross-section of the community. The right to an impartial jury applies at every stage of the jury selection process: the compiling of the master list of potential jurors, the selection of venires from that list, and the use of peremptory challenges to preclude potential jurors from serving. (*People v. Bell* (1989) 49 Cal.3d 502, 525 [262 Cal.Rptr. 1, 778 P.2d 129].) A similar and coextensive right exists under the California Constitution: "Under the federal and state Constitutions, an accused is entitled to a jury drawn from a representative cross-section of the community. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; *Duren* v. *Missouri* (1979) 439 U.S. 357, 358-367 [58 L.Ed.2d 579, 583-588, 99 S.Ct. 664] [(*Duren*)]; *People* v. *Howard* (1992) 1 Cal.4th 1132, 1159 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) That guarantee mandates that the pools from which juries are drawn must not systematically exclude distinctive groups in the community. (*People* v. *Mattson* (1990) 50 Cal.3d 826, 842 [268 Cal.Rptr. 802, 789 P.2d 983] [(*Mattson*)].)" (*People v. Horton* (1995) 11 Cal.4th 1068, 1087-1088 [47 Cal.Rptr.2d 516, 906 P.2d 478].) "The federal and state guarantees are coextensive, and the analyses are identical. (*People* v. *Bell*[, *supra*,] 49 Cal.3d 502, 525, fn. 10 . . . (*Bell*); e.g., [*People* v.] *Harris* [(1984)] 36 Cal.3d [36,] 48-49 [201 Cal.Rptr. 782, 679 P.2d 433].)" (*People v. Howard* (1992) 1 Cal.4th 1132, 1159 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

█ "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be

excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren, supra,* 439 U.S. at p. 364 [99 S.Ct. at p. 668]; *People v. Howard, supra,* 1 Cal.4th at p. 1159.) The relevant "community" for cross-section purposes is the community of qualified jurors in the judicial district in which the case is to be tried. (See *Mattson, supra,* 50 Cal.3d at p. 844; *Williams v. Superior Court* (1989) 49 Cal.3d 736, 744-745 [263 Cal.Rptr. 503, 781 P.2d 537].)

If a defendant makes a prima facie case showing that the fair-cross-section requirement is violated, "the burden shifts to the prosecution to provide either a more precise statistical showing that no constitutionally significant disparity exists or a compelling justification for the procedure that has resulted in the disparity in the jury venire. (*People v. Sanders* (1990) 51 Cal.3d 471, 491 [273 Cal.Rptr. 537, 797 P.2d 561].)" (*People v. Horton, supra,* 11 Cal.4th at p. 1088.) As to appellant's claim that he established a prima facie violation of the fair-cross-section requirement, it is not disputed that the first prong is met in that African-Americans "are a cognizable group within the meaning of *Duren.* [Citation.]" (*Bell, supra,* 49 Cal.3d at p. 526.) We address the adequacy of appellant's showing as to the second and third prongs under *Duren*'s three-prong test.

To satisfy the *second prong,* appellant must show that the number of African-Americans on venires from which juries are selected in Contra Costa County was "not fair and reasonable in relation to the number of such persons in the community." (*Duren, supra,* 439 U.S. at p. 364 [99 S.Ct. at p. 668].) Here, he sought to do so by presenting statistical evidence that the number of African-Americans in Contra Costa County totaled 8.4 percent of the county's adult population, but that only approximately 4.6 percent of the persons who appeared for jury duty in response to summons were African-Americans.[2] The trial court found that appellant made a prima facie showing as to the second prong, in that comparative disparity statistics demonstrated

---

[2]The Attorney General claims we should consider figures from 6 percent to 4.6 percent, since approximately 6 percent of the jurors in appellant's own venire were of African-American descent. Appellant, however, contends that his own survey, undertaken by Dr. Robert Ross, and partially confirmed by another public defender survey, revealed that less than 5 percent (4.6 to 4.8 percent) of the jurors called in a sample period were African-Americans. The trial court accepted appellant's showing, and we do likewise. However, we accept the Attorney General's additional argument that we must use the roughly 8 percent (8.1 percent) figure for the percentage of African-American *adults* in the county's population, rather than an 8.4 percent figure, which included all persons regardless of age. (See *Bell, supra,* 49 Cal.3d at p. 526 & fn. 12.)

"a constitutionally significant difference between the number of members of the cognizable group appearing for jury duty and the number in the relevant community." (*People v. Ramos, supra,* 15 Cal. 4th at p. 1155.) Denial of appellant's motion was predicated upon his failure to meet the third prong under *Duren,* that is to prove that the underrepresentation of African-Americans on Contra Costa County superior court venires is due to their *systematic exclusion* in the jury selection process.

Appellant introduced statistical findings from three different studies to prove the percentage of underrepresented African-Americans on the county's superior court jury venires.[3] The results of these studies showed that African-Americans made up approximately 4.6 to 6.1 percent of superior court juries. According to a 1990 census, 8.4 percent of the adult population of Contra Costa County were African-American, approximately 75 percent of whom reside in one of the county's four judicial districts, the Bay Judicial District.

With the foregoing statistical evidence as a backdrop, the initial inquiry is whether a disparity of this degree constitutes a prima facie showing under *Duren*'s second prong. As indicated *ante,* the lower court looked at these figures and found a "significant" underrepresentation of African-American jurors. It did so by utilizing the *comparative disparity test,* which measures the difference between the representation of African-Americans on jury venires against African-Americans in the general population, expressing the difference in percentage terms. Taking the telephone survey results as an illustration, a comparative disparity of 45.2 percent is shown (the percentage difference between the general population or 8.4 percent and the 4.6 percent representation on jury venires). Using another statistical test or methodology, the absolute disparity test, the result of the telephone survey would be expressed by comparing percentage points, i.e. a difference of 3.8 percent, rather than in a percentage. "Absolute disparity measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of group member on the jury wheel." (*U.S. v. Royal* (1st Cir. 1999) 174 F.3d 1, 6-7.)

In *Bell,* the challenge to the Contra Costa County jury venire involved similar allegations of underrepresentation of African-Americans. There, the

---

[3]The three studies consisted of a public defender's survey of 42 superior court jury panels from February 1996 to July 1997; a random telephone survey participated in by 608 people who appeared for jury duty from May 4-9, 1998; and data from the Contra Costa County Jury Commissioner's Office pertaining to all summoned and venired jurors for the year 1997 and February of 1998.

statistical evidence disclosed that African-Americans constituted about 8 percent of the adult population and this distinctive group comprised approximately 3 percent of the prospective superior court jurors, an absolute disparity of 5 percent. The ultimate ruling in *Bell* however did not turn on the question of whether the defendant made out a prima facie case under *Duren*'s second prong. And, while we likewise do not base our ruling on this point, the court's comment is nevertheless worthy of mention: "It does not appear that a disparity of this degree renders the representation of Blacks on jury venires less than fair and reasonable in relation to their numbers in the general population of Contra Costa County." (*Bell, supra,* 49 Cal.3d at p. 527.)[4]

Although the disparity of underrepresentation shown by the record in this case is less than that found in *Bell*, we need not determine whether this showing exceeds the constitutional limit of permissible disparity. Nor need we resolve the means by which statistical disparity should be measured under the second prong of the *Duren* test. ■ Instead, we conclude that appellant has not made a prima facie showing under the third prong—that the disparity was caused by the "systematic exclusion" of African-American jurors.

Appellant argues "that the chronic nature of the underrepresentation as well as Contra Costa County's refusal to take steps to remedy this problem itself demonstrates systematic exclusion." Appellant points to various features of the jury selection process which he claims are constitutionally impermissible and a cause of the disparity. Appellant identifies these features as including the county's failure to adequately follow up on jurors who fail to appear after being summoned; the oversummoning of Bay Judicial District jurors; and the failure to make available adequate transportation for jurors in the Bay and Delta Districts.

The underrepresentation of African-Americans on Contra Costa County jury venires, arising from the higher rate of such jurors failing to appear in response to a summons, is a long-standing problem, dating back at least 20 years. Although this court (the First District Court of Appeal) and the California Supreme Court have repeatedly addressed this problem, no easy legal solution for it has been found.

---

[4]The Supreme Court did not affirmatively rule on whether the defendant had made out a prima facie case as to the second prong, since it was "satisfied that defendant has not made out a prima facie case under the third prong by showing that the disparity is caused by 'systematic' exclusion of Blacks." (*Bell, supra,* 49 Cal.3d at p. 528.)

However, the procedures employed by the county to summon and select persons for jury service are, according to the undisputed evidence, entirely race-neutral. As the evidence disclosed and the trial court ruled, the disparity in representation is attributable to the disproportionately high rate of failure to appear by those summoned for jury service from the county's Bay Judicial District, which is located in the City of Richmond. "Statistical underrepresentation of minority groups resulting from race-neutral . . . practices does not amount to 'systematic exclusion' necessary to support a representative cross-section claim. [Citations.]" (*People v. Danielson* (1992) 3 Cal.4th 691, 706 [13 Cal.Rptr.2d 1, 838 P.2d 729].)

A prima facie case of systematic exclusion, under *Duren*'s third prong, cannot be established through appellant's claim that the county has failed to adopt other measures, which he suggests might increase the racial representation of African-Americans on jury venires in Contra Costa County. Our high court has repeatedly admonished that such reference to measures not taken by the county is insufficient to establish a prima facie case of systematic exclusion: " 'Evidence that "race/class *neutral* jury selection processes may nonetheless operate to permit the de facto exclusion of a higher percentage of a particular class of jurors than would result from a random draw" is insufficient to make out a prima facie case. ([*People v. Morales* (1989) 48 Cal.3d 527,] 546 [257 Cal.Rptr. 64, 770 P.2d 244], italics in original.)' " (*People v. Danielson, supra*, 3 Cal.4th at p. 706; see also *People v. Sanders, supra*, 51 Cal.3d 471, 492-493.)

For example, appellant suggests Contra Costa County might reduce the high failure-to-appear rate among African-American jurors by instituting such affirmative measures as "insuring direct transportation" from the west county to the site of the trial of this case in Martinez. Even the majority opinion in *People v. Buford* (1982) 132 Cal.App.3d 288 [182 Cal.Rptr. 904], the only appellate decision crediting a defendant with making out a prima facie case as to Contra Costa County venires, rejected a similar suggestion. (See *Buford, supra*, at p. 299 ["And we certainly do not suggest that a county should engage in race conscious selection procedures in order to assure representative juries."].)

Contra Costa County is not constitutionally required—and may not even be constitutionally permitted—to implement racially disparate practices such as affirmative action quotas, busing, or other race-based programs in order to correct any underrepresentation caused by factors unrelated to exclusionary features of the jury selection process: "The Sixth Amendment forbids the *exclusion* of members of a cognizable class of jurors, but it does not require that venires created by a neutral selection procedure be supplemented to

achieve the goal of selection from a representative cross-section of the population. (*United States v. Cecil* [(4th Cir. 1988)] 836 F.2d 1431, 1447-1449.)" (*Bell, supra*, 49 Cal.3d at p. 530, italics in original.)

The adoption of other measures, even if constitutionally permissible, would appear to be unavailing as a practical matter. The failure-to-appear rate for Richmond jurors remains constant, whether jurors are summoned to appear at the local Richmond courthouse or at the superior court in Martinez. In fact, to obtain sufficient jurors to operate the local Richmond courts, the county has been required to increase the frequency of summoning local Richmond residents for jury service. Appellant paradoxically assails the county for doing so, suggesting that local Richmond residents, who are likely to be African-Americans, would be less willing to serve given the greater frequency upon which they are summoned. Appellant however presents no evidence to support such speculation. Even if he were correct, such a phenomenon would not demonstrate the constitutionally impermissible " 'systematic exclusion' " of African-Americans allegedly caused by the county's jury selection process. (*Bell, supra*, 49 Cal.3d at p. 530.)[5]

In the final analysis, appellant has established nothing more than statistical evidence of disparity; he has not associated the underrepresentation of African-Americans with any constitutionally impermissible feature of the Contra Costa County jury selection process. The procedures employed by the county to summon and select persons for jury service are, according to the undisputed evidence, entirely race-neutral. The lower court found that the disparity in representation is attributable to the disproportionately high rate of failure to appear by those summoned for service from the Bay Judicial District. "Statistical underrepresentation of minority groups resulting from race-neutral . . . practices does not amount to 'systematic exclusion' necessary to support a representative cross-section claim. [Citations.]" (*People v Danielson, supra*, 3 Cal.4th at p. 706.) Nor, as we have found, is the county required to implement racially disparate practices to correct underrepresentation caused by factors unrelated to exclusionary features of the jury selection process.

The evidence presented by appellant fails to establish a prima facie case of systematic exclusion of a cognizable class in the jury selection process. The trial court did not err in making this finding. (*Bell, supra*, 49 Cal.3d at p.

---

[5]Also, there is no merit in appellant's suggestion that the county was required to conduct more extensive follow-up of African-American jurors who do not appear, in order to coerce their attendance. The county currently takes reasonable steps to follow up and urge attendance for all jurors. A more coercive and harassing approach, which singles out African-American jurors, would seemingly raise serious questions of fairness and discrimination.

530; *People v. Horton, supra*, 11 Cal.4th at p. 1090; *People v. Breaux* (1991) 1 Cal.4th 281, 299 [3 Cal.Rptr.2d 81, 821 P.2d 585].)

B.-G.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. DISPOSITION

The judgment of conviction is affirmed.

Jones, P. J., and Richman, J.,† concurred.

A petition for a rehearing was denied February 26, 2001, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 16, 2001.

---

*See footnote, *ante*, page 225.

†Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.