[No. D049796. Fourth Dist., Div. One. May 16, 2007.]

MICHAEL M. RODDY, as Jury Commissioner, etc., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
MARK JEFFREY BROWN et al., Real Parties in Interest.

1118

## COUNSEL

Horvitz & Levy, David S. Ettinger, Daniel J. Gonzalez, Peder K. Batalden; Best, Best & Krieger, Melissa W. Woo and Matthew L. Green for Petitioner.

No appearance for Respondent.

Law Office of Donald L. Levine, Donald L. Levine; Law Offices of Christopher J. Plourd and Christopher J. Plourd for Real Party in Interest Mark Jeffrey Brown.

Nancy B. Rosenfeld for Real Party in Interest David Phommachanh.

Kay Sunday for Real Party in Interest K. David Sirypangno.

Carmela F. Simoncini for California Public Defenders Association as Amicus Curiae on behalf of Real Parties in Interest.

---

## OPINION

**McDONALD, J.**—Michael M. Roddy, as Jury Commissioner for the Superior Court of San Diego County (Roddy), filed a petition for writ of mandate challenging the trial court's order enforcing the subpoenas duces tecum served on him by defendants Mark Jeffrey Brown, David Phommachanh, and Konrsavanh Donald Sirypangno (collectively, Defendants)[1] requiring Roddy to disclose certain State of California Department of Motor Vehicles (DMV) information in his (Roddy's) possession in connection with Defendants' investigation into whether the jury selection process managed by Roddy complies with constitutional standards. Roddy contends the trial court erred because (1) Code of Civil Procedure section 197[2] precludes his disclosure of that DMV information to anyone; (2) Defendants do not have a constitutional right to pretrial discovery of that DMV information; and (3) Defendants did not make the requisite showing for disclosure of that DMV information. We conclude Defendants have not shown the DMV information subject to the subpoena is relevant under the applicable standard for disclosure of information necessary to their investigation of their reasonable belief that underrepresentation of cognizable groups may be the result of improper jury selection practices. We therefore grant the petition.

### FACTUAL AND PROCEDURAL BACKGROUND

In March 2004, an information was filed charging Brown with the first degree murders of Charmaine Cannon and Faye Williams (Pen. Code, § 187, subd. (a)). The information also alleged the special circumstance as to each charge that Brown committed more than one offense of murder within the meaning of Penal Code section 190.2, subdivision (a)(3), thereby making him potentially eligible for the death penalty.

On June 14, 2006, Brown filed a motion to compel disclosure of jury information, requesting an order directing Roddy to provide certain data and

---

[1] Phommachanh and Sirypangno are defendants in separate criminal proceedings (in San Diego County Superior Court case No. SCD191585) who joined in Brown's request for information and agreed to have the trial court decide the merits of their respective disclosure requests.

[2] All statutory references are to the Code of Civil Procedure unless otherwise specified.

other materials relating to the jury selection process during the period from January 1, 2005, through September 1, 2006, including:

"1. Copies of the merged list used as the basis for all jury summons[es] from San Diego County which is a combination of the [DMV] list and the voter registration lists for San Diego County compiled pursuant to [Code of Civil Procedure] §§ 197 and 198.

"2. Copies of any and all source lists for the above described merged list including, but not limited to, the source lists as defined in CCP § 197.

"3. Copies of the master jury list as defined in CCP § 198.5, or whatever group of names is compiled from the above merged list to be used annually or periodically by the Jury Commissioner [i.e., Roddy], which list is the basis from which jury summons[es] that are sent to individuals for the periods during which jurors are called." Brown argued that, as an African-American charged with crimes and allegations making him potentially subject to the death penalty, it was essential that he be assured of a trial by a jury selected at random from a fair, representative cross-section of the community. In support of his motion, he submitted the declaration of Christopher J. Plourd, his trial cocounsel, in which Plourd stated in part: "5. I am informed and believe, based upon census data and my familiarity with jury composition studies and research, that there is a disparity between the number of Hispanics and/or African Americans living in San Diego County and the number of Hispanics and/or African Americans who are both called to serve, and those who actually serve on juries in San Diego County."

Roddy opposed Brown's motion, arguing it was an inappropriate vehicle for discovery because a subpoena duces tecum is required to obtain disclosure of documents from a third party. Furthermore, citing *People v. Jackson* (1996) 13 Cal.4th 1164 [56 Cal.Rptr.2d 49, 920 P.2d 1254] (*Jackson*), he argued Brown did not show good cause under *Jackson*'s standard for discovery of information regarding jury selection procedures: "[U]pon a particularized showing supporting a reasonable belief that underrepresentation in the jury pool or the venire exists as the result of practices of systematic exclusion, the court must make a reasonable effort to accommodate the defendant's relevant requests for information designed to verify the existence of such underrepresentation and document its nature and extent. [Citation.]" (*Jackson*, at p. 1194.) Roddy also argued section 197, subdivision (c), precluded him from disclosing to any "person, organization, or agency" the DMV source list.

In August, Brown served subpoenas duces tecum on Roddy and two of his staff members (Neal Methvin and Terri Brewton) demanding production of the same documents requested in his motion to compel, including the DMV source list. In support of the subpoena served on Roddy, Brown attached a declaration of Plourd, dated August 17, that stated in part:

"5. I have ascertained after my investigation and consultation with qualified demographic experts that there does appear to be a need for significant jury composition related investigation and/or litigation that is necessary to the competent presentation of a capital case in San Diego County. Of particular significance is a up to 50% disparity between the jury eligible population of San Diego County and the number of jurors that are actually available to be summoned by the San Diego System. [¶] . . . [¶]

"7. I believe, based upon census data and my familiarity with jury composition studies and research, consultation with qualified demographic experts that there is a significant disparity between the number of Hispanics and/or African Americans living in San Diego County and the number of Jury eligible Hispanics and/or African Americans who are both called to serve, and those who actually serve on juries in San Diego County." Roddy and his staff objected to the subpoenas duces tecum, arguing (1) Brown did not make a particularized showing for discovery under *Jackson*; (2) disclosure of jurors' identifying information would violate the jurors' constitutional privacy rights; and (3) section 197 precluded them from disclosing the DMV source list. In support of their objections, they filed a declaration of Methvin, the jury services manager of the San Diego County Superior Court, in which he stated in part:

"5. . . . [T]he Superior Court utilizes the list of registered voters in the County of San Diego and the Department of Motor Vehicles' ('DMV') list of licensed drivers and identification cardholders in the County of San Diego as its source list for the selection of prospective jurors. On behalf of the Jury Commissioner and at least twice a year, I request that the DMV and the San Diego County Registrar of Voters provide me with a list of registered voters in the County of San Diego and the DMV list of licensed drivers and identification cardholders in the County of San Diego. The DMV provides [its] list on a magnetic tape while the San Diego County Registrar of Voters provides [its] list on a CD-ROM. The Superior Court then mails the magnetic tape and the CD-ROM to its third party vendor, Jury Services, Inc. ('JSI').

JSI then merges the two lists and extracts any duplicates from the list. After the information from the DMV and the County of San Diego Registrar of Voters is merged into one list and duplicates are extracted, there are at least 1.8 million names which are loaded onto the Superior Court's in house computer server.

"6. After the information is loaded onto the Superior Court's in-house computer server and through software identified as Jury Plus Next Generation, the Superior Court staff requests that the computer system select the names of individuals to whom a summons for jury service should be issued. The number of summons[es] issued by the Superior Court on a weekly basis is based on the historical needs of the Superior Court. The computer system will not select the names of individuals who have been permanently excused due to illness, those that are deceased, and those that have served in the previous 18 months. The information of those individuals who fall into those categories are coded in the Superior Court's computer system. . . .

"7. The Superior Court issues approximately 25,000 summons[es] a week to prospective jurors or almost 1.2 million summons[es] per year. . . . When responding to the summons[es] which are issued, prospective jurors are asked to list specific reasons if they seek to be excused. If a prospective juror sends in a request to be excused, these excuses are read by the Superior Court staff and granted if they comport with the Code [of Civil Procedure]. If the excuse is not permissible under the Code, the prospective juror will receive a 'kick-back' letter requiring them to serve. . . . For those prospective jurors who do not request an excuse or a postponement, they report for service pursuant to the summons[es] issued.

"8. On a given week, approximately 2,400 prospective jurors are asked to report for jury service at the Superior Court. . . .

"9. For those prospective jurors [who] report for jury service and remain for service, they are randomly assigned to the various courtrooms by the Superior Court's computer system. . . ." His declaration further stated: "The Superior Court does not maintain in its records a hard copy of the master jury list. The master jury list contains approximately 600,000 to 800,000 names. It is from these names from which the Superior Court's computer system randomly selects individuals to whom summons[es] are issued. As set forth above, the merged list, once duplicates are eliminated, are uploaded into the Superior Court's in house computer server. Thereafter, the Superior Court's computer system randomly selects names to whom summons[es] will be issued which includes approximately 600,000 to 800,000 names because the computer system will not select individuals who have been permanently excused or who have served in the prior 18 months."

At a hearing on September 5, the trial court initially commented that without the presentation of further evidence, Brown and the other defendants had not yet made the requisite "particularized showing" for disclosure of any information regarding the jury selection process.[3] The court stated Plourd's declaration (apparently, based on the language the court paraphrased, referring to Plourd's Aug. 30 supplemental declaration, quoted later in this opinion, in support of Brown's motion to compel), by itself, was conclusory and insufficient to make a particularized showing for discovery.[4] In arguing what deficiencies or improper practices he sought to investigate, Plourd stated: "I do not contend that the way that the San Diego system actually does the merging [of the source lists] is defective." He then requested that he be allowed to present the testimonies of the witnesses he served with subpoenas. He first called Methvin to testify. Methvin stated that twice a year the court receives magnetic tapes from the DMV listing the names and addresses of all persons 18 years of age or older who have San Diego County addresses and hold a driver's license or identification card. On receipt of the DMV's magnetic tapes, he then requests the list of registered voters maintained by the San Diego County Registrar of Voters on a CD. The court then mails the magnetic tapes and CD to JSI (Jury Systems Incorporated) in El Segundo.

JSI merges both lists and deletes duplicates, resulting in a combined source list, which it downloads directly onto the court's computer system. Methvin had been told there were about 1.8 million names on that merged list. He did not have any personal knowledge of how JSI processed and merged the two source lists. He explained that the Code of Civil Procedure provides persons with permanent and temporary excuses from jury service. The court's staff inputs appropriate codes onto the computerized list for those persons qualifying for particular excuses from jury service.[5] He confirmed the response rate to summonses mailed out for jury service was sometimes under 25 percent and even sometimes under 10 percent. However, he later explained that "even though it appears that a small percentage shows up, the vast majority actually either wrote in to be excused or have [their jury service] postponed to a different date." A third party vendor (Zumudio or Z.D.I.) prints and mails out summonses based on the names and addresses randomly selected by the court's computer. The court does not conduct any followup regarding persons

---

[3] Counsel for Phommachanh and Sirypangno also appeared at the hearing. The trial court noted that those defendants had criminal proceedings pending before Judge Deddeh (in case No. SCD191585), who had issued orders allowing them to join in Brown's discovery motion and to be bound by the trial court's decision on the instant discovery matter.

[4] Plourd's August 30 supplemental declaration is quoted below, as it first appears later in the record. However, as noted in footnote 10, we assume that supplemental declaration was considered by the trial court in making its September 5 statements.

[5] The court staff also inputs codes for those persons not qualified to serve as jurors (e.g., persons who are not United States citizens or who do not speak English).

who do not show up or respond to jury service summonses.[6] The court's jury services office had not performed any surveys or analyses within the past five to 10 years to determine whether the persons appearing for jury service represent a fair cross-section of the community. Based on his experience, he did not know whether there were higher or lower response rates from certain areas of San Diego County, or whether the court's jury services office had performed any studies regarding those possible variations in response rates.

Defendants then called Brewton to testify. She is the court's operations supervisor in the jury services office. Under Methvin's direction, she determines on a weekly basis how many persons need to be summoned for jury service at each court location. She creates the computer files for the needed summonses, and transfers that information to a third party vendor for creation and mailing of the summonses.

Defendants then called John Weeks, a defense demographic expert, to testify. He stated he had analyzed the demographics of the San Diego region. Demographic details can be discerned by ZIP code, based on 2000 census data and recent data from the American community survey. He understood that the court's master jury list is obtained by merging the DMV's records with the San Diego Registrar of Voters's records and then eliminating duplicates. He could not know whether that merging and elimination process is correctly done unless he systematically analyzed the process and the list(s). To do so, he would need to know the precise algorithm used. He did not understand how the 600,000 names of persons eligible to receive summonses were calculated. However, of particular import in this case, Weeks testified he did not disagree with the number of persons included on the merged or master jury list. Weeks was asked: "[W]ere you asked to determine how many people should be on the list of people that is created from the D.M.V. and the voter registration list once it's merged and duplicates are substantially eliminated?" Weeks replied, "Yes." He was asked: "Would that be approximately 1.8 million people?" He replied: "It would be close to that, yes." He then was asked: "So the 1.8 [million] should be what is termed the master jury list where summonses could be sent, is that correct?" He replied, "That's correct." He then stated that if the master list of persons eligible to be served with summonses had only 600,000 names on it, the list would underrepresent the jurors eligible to be called for jury service by over 50 percent and that underrepresentation probably would affect the jury service of cognizable groups.

---

[6] Apparently, if some members of a group summoned for jury service on a particular date show up and serve, those other members of that group who do not show up for jury service (without obtaining an excuse or delay) are effectively excused from jury service for 18 months along with the entire group.

On cross-examination by Roddy, Weeks testified that although he had read Methvin's declaration, he (Weeks) did not have any report showing the breakdown of persons permanently or temporarily excused from jury service for various reasons and therefore did not understand how the master list could start out with 1.8 million names and result in only 600,000 to 800,000 names. He believed the persons excused from jury service were "self-selected" and therefore the jury selection system was "non-random." He also suspected the process was not random because Methvin stated 25,000 summonses were mailed weekly (for an annual total of about 1.2 million), yet the master jury list included only 600,000 to 800,000 persons eligible to receive them. He also believed the jury selection process was not random because only 2,400 persons responded to summonses out of 25,000 mailed weekly (i.e., a yield of less than 10 percent). He stated that the "[p]robability of that sample [of persons responding to summonses] being random is essentially zero." He elaborated, based purely on statistical analysis: "So what I'm saying is that the people who show up in the jury lounge are almost certainly not representative of the jury eligible population in the community. Certainly not representative of the master list." He admitted he had not analyzed the racial composition of the particular numbers reflected in Methvin's declaration. He confirmed the San Diego County Superior Court did not collect data on race and ethnicity of persons who respond to jury summonses. He suggested that, as part of Defendants' investigation, questionnaires be distributed to those persons who report for jury service that would allow him (Weeks) to determine the demographic composition of those jury pools. Weeks confirmed that neither the DMV source list nor the voter registration list contained any information on race or ethnicity, although he had "done some work with Spanish surnames as well as with Asian surnames, but there's no way from a list of names to identify African-Americans."

Defendants stated they had no objection to the trial court's consideration of Methvin's declaration in deciding the matter. The court then continued the hearing until September 13 to hear arguments of counsel.

On September 12, Defendants filed a supplemental memorandum of points and authorities on the matter. In summarizing the facts, they stated in part: "Methvin sends the two source lists [i.e., DMV source list and voter registration source list] to [JSI] who contracts with the San Diego [County] Superior Court. Methvin presumes that JSI merges the two lists and eliminates duplicates. [Citation.] No one has ever verified that these steps are done correctly, however, *the combined list,* referred to as the 'Master List' . . . , which is electronically sent to San Diego County, *has approximately 1.8 million names of 'prospective Jurors'* . . . . *Dr. Weeks believes this is approximately the correct number of people that should be on the list.* [Citation.]" (Italics added.)

At the continued hearing on September 13, the trial court discussed the applicable standard under *Jackson* for discovery of information regarding the jury selection process. The court stated that under *Jackson* a defendant must make a particularized showing supporting a reasonable belief that underrepresentation of a cognizable group in the jury pool or venire exists as a result of practices of systematic exclusion. If a defendant makes the requisite particularized showing for discovery, the court must then make a reasonable effort to accommodate the defendant's relevant request for information designed to verify the existence of the asserted underrepresentation and document its nature and extent. Accordingly the trial court commented:

"So even if I am persuaded, the particularized showing require[s] [me] to grant the motion, that doesn't ipso facto mean that I am going to give them everything in that long laundry list set forth in [Defendants'] request.

"It might be a short step-by-step process. So even if I grant the motion in principle, if you will, then we still—that's still a loss, and fine-tuning as we go along and exactly the full breadth and depth and the extent of the discovery which I will permit." The court then heard arguments of counsel. The trial court found Defendants had made a particularized showing for discovery, stating: "I am persuaded . . . [Defendants have made] . . . a particularized showing which supports a reasonable belief that, one, there was some [under]representation of cognizable groups and that there is a due process [issue]." It then stated the next step would be to decide what information must be disclosed. Roddy and Defendants indicated they would meet and confer on that issue and on the wording of a protective order.

On September 27, Roddy filed a brief regarding the status of the parties' meeting and conferring. He stated he and his staff had located much of the information sought by Defendants.[7] Roddy stated: "The Superior Court is willing to produce to [Defendants], subject to a protective order and payment of reasonable and actual costs for retrieval and reproduction, the universe of documents and information which has been located to date by Superior Court *with the exception of the magnetic tapes from the [DMV]*, other private juror

---

[7] Roddy stated: "As a result of Superior Court's searches and inquiries, Superior Court has located the following categories of documents and/or information: (1) policies and procedure manuals from the various court locations with jury services relating to the jury selection process, jury selection software and juror orientation; (2) policies and procedures from Superior Court's third-party vendor; (3) videos and/or DVDs shown to prospective jurors during jury orientation in some of the various court locations with jury services; (4) juror summons[es]; (5) form of juror 'kick-back' letters; (6) juror surveys; (7) magnetic tapes from the [DMV]; (8) CD-ROMs from the Registrar of Voters; and (9) contracts with third-party vendors. [¶] Superior Court also maintains information in its database relating to the jury selection process in San Diego County which information, if extracted, would be responsive to certain requests by [Defendants]."

information, and juror summons[es]." (Italics added.) Roddy argued that section 197 precluded him from disclosing the DMV magnetic tapes to anyone. He noted that, however, "the information which is contained in the magnetic tapes is included within the information which Superior Court is willing to provide . . . . For instance, . . . [Defendants have] requested copies of the merged list, master jury list, and qualified jury list. The information set forth in the magnetic tapes would be duplicative of those requests."

Also on that date, Roddy submitted the declaration of Mark Schienbein, the president and chief executive officer of JSI, who stated:

"3. . . . Twice a year, JSI receives a list of licensed drivers and identification cardholders in the County of San Diego on a magnetic tape provided by the DMV to the Superior Court, and a list of the registered voters in the County of San Diego on a CD-ROM provided by the County of San Diego Registrar of Voters to the Superior Court. JSI then merges the two lists and extracts any duplicates from the list.

"4. After the information from the DMV and the County of San Diego Registrar of Voters is merged into one list and duplicates are extracted, additional individuals are removed from the merged list in accordance with the Trial Jury Selection and Management Act and Superior Court rules and procedures, including but not limited to individuals who have been permanently excused due to illness, those [who] are deceased, those [who] have recently served as jurors, and those who have been temporarily excused for other reasons.

"5. Following the removal of these individuals . . . , the list is then loaded onto the Superior Court's in-house computer server . . . twice a year. . . . The number of individuals loaded onto the Superior Court's in house computer server on these four occasions [i.e., from January 1, 2005 through September 1, 2006] averaged approximately 800,000 names." He stated JSI could create copies of the four DMV source lists it received during that period. Each of the lists generated by JSI per Defendants' requests would include the full name, ZIP code, and date of birth of each prospective juror.

On October 10, Roddy filed the supplemental declaration of Methvin, in which Methvin corrected certain misstatements in his original declaration filed on September 1 and testimony at the September 5 and 7 hearings, based on his further review of the records of the San Diego County Superior Court regarding the jury selection process. He stated:

"5. . . . [A]t least twice a year, the Superior Court is provided with a list of the registered voters from the [Registrar of Voters] and with a list of licensed

drivers and identification cardholders from the DMV, each list containing respective individuals in the County of San Diego. . . . The Superior Court then mails the magnetic tape and the CD-ROM to its third party vendor [JSI]. I am informed and believe that JSI performs a merge of the two lists (i.e., the voter file and driver file), and extracts any duplicates from the list. Thereafter, JSI 'suppresses' those individuals who have been coded as permanently or temporarily excused on the Superior Court's computer system and those individuals who have served on a jury within a past set timeframe. 'Suppression' is used to help alleviate sending out summonses to jurors who have been permanently or temporarily excused, or previously served within a set timeframe.

"6. After the information from the DMV and the [Registrar of Voters] is merged into one list and duplicates are extracted, but prior to suppression, during the time period in question, between January 1, 2005 and September 30, 2006, approximately 2.4 to 2.5 million names of prospective jurors remained on the list. Approximately every six months, when updated lists were received from the DMV and [Registrar of Voters], JSI reconducts the merge/purge/suppression/load process. As detailed in paragraph 14 of this Supplemental Declaration, additional duplicates, as well as individuals who were permanently or temporarily excluded, and individuals who had completed jury service within the set timeframe, 24 months during this period, had been removed and all remaining eligible jurors were loaded into the Superior Court's computer system by JSI . . . . I previously indicated in my declaration and during my testimony . . . that there were 1.8 million names of prospective jurors after the information from the DMV and [Registrar of Voters] was merged into one list and duplicates were extracted. The 1.8 million figure was based on my best recollection at the time I provided the declaration and at the time of my testimony, but I have since learned that the figure understates the approximate total. Upon further review of the Superior Court's records, I determined that the number of names remaining after the two lists are merged and duplicates have been extracted was actually between 2.4 and 2.5 million." Methvin also stated: "Based on further review of the Superior Court's computer system, I have subsequently determined that individuals who had served within the last 24 months were being excused, instead of only individuals who had served with[in] the last 12 months. I have made modifications to the Superior Court system so that individuals who have served only within the last 12 months are now being excused. JSI has been directed to take immediate steps to add any individuals who had been suppressed from the master jury list just for serving more than 12 months— but not more than 24 months—previously."

On October 26, Roddy filed a second supplemental declaration of Methvin, in which Methvin stated: "On or about October 23, 2006, JSI completed a new load of the Superior Court's master jury list. After the DMV and

[Registrar of Voters] lists were merged and duplicates were eliminated, approximately 2.5 million names remained on the list. After JSI suppressed out individuals who were deceased, permanently excused due to a permanent medical disability, excused for recent [jury] service, or temporarily excused for another reason, approximately 1.2 million names remained on the list. The 1.2 million names were loaded onto the Superior Court's in-house computer server. . . . Superior Court has already utilized this new load which contains approximately 1.2 million names to issue summons[es] for prospective jurors . . . ."

Also on October 26, Roddy filed a supplemental declaration of Schienbein, who stated:

"9. On or about October 14, 2006, JSI, at the direction of the Superior Court, commenced the process of performing a new merge/purge/suppression/load process. JSI began this process on or about October 14, 2006, with the creation of a suppression file out of the Superior Court's existing database. Thereafter, on or about October 16, 2006, JSI merged the DMV and [Registrar of Voters] list[s] and suppressed out those individuals who were deceased, permanently excused because of medical illness, those who recently served as jurors, and those who were temporarily excused for other reasons. This process was completed on or about October 17, 2006. . . . On or about October 19, 2006, JSI completed a second suppression to account for any changed addresses received from [the National Change of Address]. On or about October 20, 2006, JSI began loading the list onto the Superior Court's in-house computer server. The load was completed on October 23, 2006 ('2007A Load').

"10. With respect to the 2007A Load, there were 3,550,747 combined records from the DMV and the [Registrar of Voters]. After JSI eliminated duplicates from the merged list, there were 2,585,007 names which remained. Pursuant to the direction of the Superior Court, JSI then suppressed the four categories of individuals from the merged list of the DMV and [Registrar of Voters] records after the duplicates were eliminated [i.e., persons who are deceased, permanently excused due to illness, temporarily excused for other reasons, and have served within the last 12 months]. . . . After this process, between October 20 and October 23, 2006, 1,221,817 names were loaded onto the Superior Court's in-house computer server. This is the list from which the Superior Court staff may request that the computer system select the names of individuals to whom a summons for jury service should be issued.

"11. At the direction of the Superior Court, JSI performed an analysis as [to] the number of prospective jurors who were suppressed from the master

list and the basis for their suppression prior to the recent [October 20 through 23 merge/extract/suppression/load process]. JSI's analysis revealed that approximately 225,000 names were suppressed from the merged list [as permanently excused]. Since the Superior Court has removed certain categories of individuals from the permanent excuse category and has changed its business practice to only permit a 12 month reprieve from jury service after recent service, the 2007A Load contains approximately 350,000 to 470,000 names more than the four loads which occurred between January 1, 2005 and September 30, 2006."

At an October 27 hearing, Roddy, citing the supplemental declarations of Methvin and Schienbein, noted the San Diego County Superior Court's jury selection system had changed since the last hearing and requested the trial court reconsider its ruling that Defendants had made a particularized showing for discovery of information. Having only recently received those additional documents, the court stated it was not yet in a position to make a definitive ruling on that request. The court then noted it had signed the protective order and directed Roddy to provide Defendants with most of the information sought, including the jury selection policies.[8] When asked what information Roddy believed should not be disclosed, he answered that the DMV source list should not be disclosed. He argued section 197 precluded disclosure of the DMV source list. The trial court rejected his argument that the DMV source list should not be disclosed, stating: "*I will order the production of the [DMV] source list.*" (Italics added.) The court gave Roddy two weeks to produce all information sought by Defendants.

On November 2, citing recent changes made in the jury selection system, Roddy filed a motion for reconsideration of the trial court's September 13 order finding Defendants had made a particularized showing under *Jackson* for discovery of information regarding the jury selection process. In particular, Roddy argued that the information originally sought by Defendants regarding the jury selection process from January 1, 2005, through September 1, 2006, was no longer relevant to an investigation of the current process because the San Diego County Superior Court changed its procedures as of October 23. Therefore, he argued the trial court's finding that Defendants had made a particularized showing was based on a jury selection process that no longer exists.[9] In support of his motion for reconsideration, Roddy lodged with the court certain documents, including a supplemental declaration of Plourd (Brown's cocounsel) dated August 30 in support of his (Brown's)

---

[8] The record includes a copy of a protective order signed by the trial court and the parties' counsel, which order was filed on October 27.

[9] Apparently in support of that motion, Roddy submitted a declaration of Donald Kenneth Greenspan, the chief executive officer of Sea-Net Holdings, Inc. (doing business as ZDI), in which he (Greenspan) stated ZDI had a contract with the San Diego County Superior Court to print and mail summonses to prospective jurors. On a weekly basis, ZDI receives from the

motion for discovery of jury information.[10] In that declaration, Plourd stated in part: "4. Based upon my investigation, based upon my understanding of census data, based upon my familiarity with jury composition studies, based upon my research, and based upon my consultation with experts there is a significant disparity between the number of jury eligible Hispanics and/or African Americans living in San Diego County and the number of Hispanics and/or African Americans who are both called to serve, and those who actually serve on juries in San Diego County. I am specifically advised and have learned that, 1.) The list(s) used to summon jurors significantly under-represent the Jury eligible minority population of San Diego County, 2.) That the method(s) used by San Diego County to summon jurors results in significantly less than Thirty [percent] (30%) of persons summoned for jury service, 3.) That a combination of errors makes the San Diego County system non-random, 4.) That as the result of the multiple errors and omissions by the San Diego County Jury Commissioner cognizable groups are significantly and not fairly represented on any San Diego County Jury Panels, and 5.) The errors and omissions are known or reasonably should be known to the officials who manage or oversee the San Diego County Jury System." Defendants filed a memorandum opposing Roddy's motion for reconsideration.

On November 15, the trial court denied Roddy's motion for reconsideration.

On November 17, Roddy filed the instant petition for writ of mandate, challenging the trial court's order directing him to produce the DMV source list. On November 20, we stayed the trial court's September 13 and October 27 orders requiring disclosure of the DMV source list. Defendants filed a response to the petition. On December 6, we issued an order to show cause why the relief requested should not be granted. Also on December 6, we issued an order stating that we would consider the instant petition together with the petition in *Guillen v. Superior Court* (May 16, 2007, D049769) (nonpub. opn.). Roddy filed a reply to Defendants' response. On January 19, 2007, we granted the request of the California Public Defenders Association to file, and accepted as filed, an amicus curiae brief in support of Defendants. Subsequently, we accepted as filed Roddy's answer to that amicus curiae brief.

---

court data that it uses to print and mail those summonses. The total number of summonses mailed by ZDI is about 25,000 per week.

[10] *Although the copy lodged by Roddy is not* date-stamped as filed with the trial court, we will assume for purposes of this opinion that it was, in fact, filed with and considered by the court in deciding the discovery matter. In particular, we will assume that Plourd's August 30 declaration was considered by the trial court in both deciding on September 13 that Defendants had made a particularized showing for discovery of information and on October 27 that Roddy must disclose to Defendants the DMV source list:

DISCUSSION

I

*Criminal Defendant's Constitutional Right to Jury Drawn
from a Representative Cross-section of the Community*

 "Under the federal and state Constitutions, an accused is entitled to a jury drawn from a representative cross-section of the community. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; [citations].) That guarantee mandates that the pools from which juries are drawn must not systematically exclude distinctive groups in the community. [Citation.]" (*People v. Horton* (1995) 11 Cal.4th 1068, 1087–1088 [47 Cal.Rptr.2d 516, 906 P.2d 478] (*Horton*).) "The federal and state guarantees are coextensive, and the analyses are identical. [Citations.]" (*People v. Howard* (1992) 1 Cal.4th 1132, 1159 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

"[T]o establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren v. Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 99 S.Ct. 664].) "The relevant 'community' for cross-section purposes is the community of qualified jurors in the judicial district in which the case is to be tried. [Citations.]" (*People v. Currie* (2001) 87 Cal.App.4th 225, 233 [104 Cal.Rptr.2d 430].)

Regarding the third element of the *Duren* test, the California Supreme Court stated: "A defendant does *not* discharge the burden of demonstrating that the underrepresentation was *due to systematic exclusion merely by offering statistical evidence of a disparity.* A defendant *must show,* in addition, that *the disparity is the result of an improper feature of the jury selection process.* [Citation.] Riverside County relies on voter registration lists and [DMV] records of registered drivers and holders of identification cards, which are merged into a master list. We have held that such a list ' " 'shall be considered inclusive of a representative cross-section of the population' " where it is properly nonduplicative.' [Citation.] The record reveals that Riverside County has undertaken reasonable efforts to eliminate duplicate entries and, as the trial court found, there was no evidence how (if at all) the remaining duplicates would have affected the composition of the jury draw." (*People v. Burgener* (2003) 29 Cal.4th 833, 857 [129 Cal.Rptr.2d 747, 62 P.3d 1] (*Burgener*), italics added.)

██ "When a county's jury selection criteria are neutral with respect to race, ethnicity, sex, and religion, the defendant must identify some aspect of *the manner in which those criteria are applied* (the probable cause of the disparity) that is constitutionally impermissible. [Citations.]" (*Horton, supra,* 11 Cal.4th at p. 1088.) "The third prong requires defendant to show the state selected the jury pool in a constitutionally impermissible manner that was the probable cause of the disparity. [Citation.]" (*People v. Ochoa* (2001) 26 Cal.4th 398, 427 [110 Cal.Rptr.2d 324, 28 P.3d 78].) "Statistical underrepresentation of minority groups resulting from race-neutral . . . practices does not amount to 'systematic exclusion' necessary to support a representative cross-section claim. [Citations.]" (*People v. Danielson* (1992) 3 Cal.4th 691, 706 [13 Cal.Rptr.2d 1, 838 P.2d 729], overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].)

Alternatively stated, " '[e]vidence that "race/class *neutral* jury selection processes may nonetheless operate to permit the de facto exclusion of a higher percentage of a particular class of jurors than would result from a random draw" is insufficient to make out a prima facie case. [Citation.]' " (*People v. Danielson, supra,* 3 Cal.4th at p. 706.) For example, "the failure of a particular group to register to vote in proportion to its share of the population cannot constitute improper exclusion attributable to the state. [Citation.] So long as the state uses criteria that are neutral with respect to the underrepresented group, a defendant cannot satisfy *Duren*'s third prong by showing the state could have adopted other measures to improve further the group's representation. [Citation.] The challenged state action must be the probable *cause* of the disparity [citation] . . . ." (*People v. Ochoa, supra,* 26 Cal.4th at pp. 427–428.)[11]

██ A jury commissioner is not "required to implement racially disparate practices to correct underrepresentation caused by factors unrelated to exclusionary features of the jury selection process." (*People v. Currie, supra,* 87 Cal.App.4th at p. 237.) Furthermore, "[s]peculation as to the source of the disparity is insufficient to show systematic exclusion [citation], as is evidence the disparity is unlikely to be a product of chance [citation] or has endured for some time [citation]." (*Burgener, supra,* 29 Cal.4th at p. 858.) Expert opinion regarding the cause of any disparity, if unsupported by statistical or other empirical evidence, is merely speculation and is insufficient to show that disparity was the result of improper systematic exclusion. (*Horton, supra,* 11 Cal.4th at pp. 1089–1090; *People v. Cummings* (1993) 4 Cal.4th 1233, 1278–1279 [18 Cal.Rptr.2d 796, 850 P.2d 1] (*Cummings*).)

---

[11] Similarly, a "defendant cannot demonstrate systematic exclusion based upon the even-handed application of a neutral criterion, such as hardship [excuses]. [Citation.]" (*People v. Howard, supra,* 1 Cal.4th at p. 1160.)

In investigating whether a claim of an underrepresentative jury selection process may exist, a defendant has certain rights to discovery. Those pretrial discovery rights apparently are based on a defendant's Fourteenth Amendment right to due process, including the right to a fair trial. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 805–806, fn. 18 [268 Cal.Rptr. 753, 789 P.2d 934].) In *Jackson*, the California Supreme Court stated: "Here we consider not whether defendant has made a prima facie case, but the prior question of whether defendant was wrongly denied the discovery of information necessary to make such a case. A defendant who seeks access to this information is obviously not required to justify that request by making a prima facie case of underrepresentation. Rather, *upon a particularized showing supporting a reasonable belief that underrepresentation in the jury pool or the venire exists as the result of practices of systematic exclusion, the court must make a reasonable effort to accommodate the defendant's relevant requests for information designed to verify the existence of such underrepresentation and document its nature and extent.* (Cf. *City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 93 [260 Cal.Rptr. 520, 776 P.2d 222] [complaints of excessive force by arresting police officers discoverable by defendant upon 'reasonable belief.'].)" (*Jackson, supra*, 13 Cal.4th at p. 1194, italics added.) "[A] 'reasonable belief' is simply a 'conviction of mind . . . *arising by way of inference*' [citation], a 'belief begotten *by attendant circumstances, fairly creating it, and honestly entertained.*' [Citation.]" (*City of Santa Cruz, supra*, 49 Cal.3d at p. 93.)[12] Regardless of a defendant's constitutional right to pretrial discovery, "some of the information sought, such as master lists of jury pools, as well as general jury selection policies and practices, are judicial records that are or should be available to the public. [Citations.]" (*Jackson, supra*, at pp. 1194–1195.)

## II

### *Trial Jury Selection and Management Act Generally*

In 1988, the Trial Jury Selection and Management Act (§ 190 et seq.) was enacted. (Stats. 1988, ch. 1245, § 2, p. 4140.) Section 191 provides:

---

[12] In *City of Santa Cruz*, the court concluded the defendant had shown such a reasonable belief in the circumstances of that case: "Counsel's statement of 'belief' that the City 'may' have other complaints of excessive force against the officers in question constitutes a rational inference from the facts of the pending litigation. The police reports state that one of the arresting officers struck defendant with a closed fist and that both officers subsequently wrestled him to the ground. Counsel's affidavit avers that the officers continued to apply unnecessary and excessive force even after defendant was handcuffed and subdued. While the recited facts do not, of course, establish that the force used was in fact excessive, it is altogether fair and rational, on the basis of such facts and averments, to entertain a 'reasonable belief' or inference that the same officers may have been accused of the use of excessive force in the past, and that such information may be found in their personnel records." (*City of Santa Cruz v. Municipal Court, supra*, 49 Cal.3d at p. 93, fn. omitted.)

"The Legislature recognizes that trial by jury is a cherished constitutional right, and that jury service is an obligation of citizenship.

"It is the policy of the State of California that all persons selected for jury service shall be selected at random from the population of the area served by the court; that all qualified persons have an equal opportunity, in accordance with this chapter, to be considered for jury service in the state and an obligation to serve as jurors when summoned for that purpose; and that it is the responsibility of jury commissioners to manage all jury systems in an efficient, equitable, and cost-effective manner, in accordance with this chapter." It is the primary responsibility of the jury commissioner in each county to manage the jury system of the county's trial courts. (§ 195, subd. (c).) Section 195 provides:

"(a) In each county, there shall be one jury commissioner who shall be appointed by, and serve at the pleasure of, a majority of the judges of the superior court. In any county where there is a superior court administrator or executive officer, that person shall serve as ex officio jury commissioner. . . . [¶] . . . [¶]

"(c) The jury commissioner shall be primarily responsible for managing the jury system under the general supervision of the court in conformance with the purpose and scope of this act. He or she shall have authority to establish policies and procedures necessary to fulfill this responsibility."

Of particular importance in this case, section 197 provides:

"(a) All persons selected for jury service shall be selected at random, from a source or sources inclusive of a representative cross section of the population of the area served by the court. Sources may include, in addition to other lists, customer mailing lists, telephone directories, or utility company lists.

"(b) *The list of registered voters and the Department of Motor Vehicles' list of licensed drivers and identification cardholders resident within the area served by the court, are appropriate source lists for selection of jurors. These two source lists, when substantially purged of duplicate names, shall be considered inclusive of a representative cross section of the population, within the meaning of subdivision (a).*

"(c) The Department of Motor Vehicles shall furnish the jury commissioner of each county with the current list of the names, addresses, and other identifying information of persons residing in the county who are age 18

years or older and who are holders of a current driver's license or identification card . . . . The conditions under which these lists shall be compiled semiannually shall be determined by the director, consistent with any rules which may be adopted by the Judicial Council. . . . *The jury commissioner shall not disclose the information furnished by the Department of Motor Vehicles pursuant to this section to any person, organization, or agency."* (Italics added.)

### III

### *Application of the* Jackson *Test in This Case*

Roddy contends that because Defendants did not make the requisite "particularized showing" under *Jackson*, the trial court erred by concluding Defendants were entitled to discovery of the DMV source list. He also asserts the DMV source list is irrelevant to Defendants' concerns regarding possible underrepresentation of cognizable groups in the jury pool.

For purposes of our opinion, we assume arguendo that Defendants, in general, made a sufficient "particularized showing" under *Jackson* and, accordingly, are entitled to *some* discovery of information regarding the jury selection process of the San Diego County Superior Court. However, the mere fact that Defendants made that showing does *not* necessarily entitle them to discovery of any and all information they seek regarding the jury selection process. On the contrary, as *Jackson* states: "[U]pon a particularized showing supporting a reasonable belief that underrepresentation in the jury pool or the venire exists as the result of practices of systematic exclusion, *the court must make a reasonable effort to accommodate the defendant's relevant requests for information designed to verify the existence of such underrepresentation and document its nature and extent."* (*Jackson, supra*, 13 Cal.4th at p. 1194, italics added.) Although the California Supreme Court has not (in *Jackson* or in any case subsequent thereto) explained, interpreted, or applied that standard of relevance for discovery of information regarding the jury selection process after a particularized showing has been made, we conclude the relevance of a defendant's request for information must necessarily be considered in relation to the particularized showing made by the defendant.

Alternatively stated, upon a particularized showing by a defendant under *Jackson*, the trial court (or jury commissioner on its behalf, as in this case) must make a reasonable effort to produce information that is relevant to

potentially verify or prove the existence of constitutionally improper underrepresentation in the jury selection process and document the nature and extent of that underrepresentation. (*Jackson, supra,* 13 Cal.4th at p. 1194.) To the extent certain information sought to be discovered is not relevant to potentially verify, prove, and/or document the underrepresentation reasonably believed to be the result of practices of systematic exclusion pursuant to the defendant's particularized showing, the defendant is not entitled to discovery of that information under *Jackson.* (*Ibid.*) In other words, although a defendant may make a sufficient "particularized showing" under *Jackson* entitling him or her to *some* discovery of information regarding the jury selection process, the scope of that discovery right must be determined in accordance with that showing made by the defendant (i.e., there must be a nexus of relevance between the information sought and the defendant's particularized showing).[13] Accordingly, a defendant does *not* necessarily obtain a right under *Jackson* to essentially audit the *entire* jury selection process on merely making a particularized showing supporting a reasonable belief that underrepresentation exists as the result of a specific practice or practices of systematic exclusion.

Applying our interpretation of *Jackson* to the circumstances in this case, we conclude discovery of the DMV source list is not relevant to potentially verify, prove, or document Defendants' claim, as reflected in their particularized showing, of the underrepresentation that they reasonably believe exists and that is the result of practices of systematic exclusion. Defendants' particularized showing is based primarily on the declarations of Plourd (Brown's cocounsel), as quoted above, and the testimony of Weeks, the defense demographic expert. Plourd's initial declaration dated June 14, 2006, as quoted above, is both conclusory and speculative and does not support

---

[13] Our interpretation of the requisite relevance under *Jackson* for discovery of jury selection information differs from the general standard of relevance used to determine the admissibility of evidence. (Cf. Evid. Code, §§ 210, 351.) Evidence Code section 210 provides: " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." In that context, *People v. Morrison* (2004) 34 Cal.4th 698 [21 Cal.Rptr.3d 682, 101 P.3d 568] stated: "Evidence possessing any tendency in reason to prove or disprove any disputed material fact is relevant. [Citations.] . . . *Evidence is irrelevant, however, if it leads only to speculative inferences.* [Citation.]" (*Id.* at p. 711, italics added.) Because in this case we must determine the relevancy of information (i.e., the DMV source list) sought to be discovered by Defendants in relation to their investigation whether they are being denied their constitutional right to a jury drawn from a representative cross-section of the community, we apply a different standard of relevancy from that under Evidence Code sections 210 and 351. The "relevancy" required for information sought to be discovered under *Jackson* means that information must "relate to" the defendant's particularized showing and, in particular, the information's potential relevance or probative value in verifying the existence of underrepresentation and documenting its nature and extent based on the particularized showing made by the defendant. (*Jackson, supra,* 13 Cal.4th at p. 1194.)

either a reasonable belief that the perceived underrepresentation of Hispanics and/or African-Americans in San Diego County's jury pool or venire is the result of improper practices of systematic exclusion *or* is relevant to potentially verify, prove, or document Defendants' claim, as reflected in their particularized showing, of the underrepresentation that they reasonably believe exists and that is the result of practices of systematic exclusion.[14] (*Jackson, supra,* 13 Cal.4th at p. 1194; *Burgener, supra,* 29 Cal.4th at p. 858; *Horton, supra,* 11 Cal.4th at pp. 1089–1090; *Cummings, supra,* 4 Cal.4th at pp. 1278–1279.)

Likewise, Plourd's declaration dated August 17, as quoted above, is both conclusory and speculative and does not support either a reasonable belief that the perceived underrepresentation of Hispanics and/or African-Americans in San Diego County's jury pool or venire is the result of improper practices of systematic exclusion *or* is relevant to potentially verify, prove, or document Defendants' claim, as reflected in their particularized showing, of the underrepresentation that they reasonably believe exists and that is the result of practices of systematic exclusion.[15] (*Jackson, supra,* 13 Cal.4th at p. 1194; *Burgener, supra,* 29 Cal.4th at p. 858; *Horton, supra,* 11 Cal.4th at pp. 1089–1090; *Cummings, supra,* 4 Cal.4th at pp. 1278–1279.)

Likewise, Plourd's supplemental declaration dated August 30, as quoted above, is both conclusory and speculative and does not support either a reasonable belief that the perceived underrepresentation of Hispanics and/or African-Americans in San Diego County's jury pool or venire is the result of improper practices of systematic exclusion *or* is relevant to potentially verify,

[14] In that declaration, Plourd stated: "I am informed and believe, based upon census data and my familiarity with jury composition studies and research, that there is a disparity between the number of Hispanics and/or African Americans living in San Diego County and the number of Hispanics and/or African Americans who are both called to serve, and those who actually serve on juries in San Diego County." There is nothing in that statement (or elsewhere in that declaration) specifically alleging, much less showing, the perceived underrepresentation may be caused by the improper merging of the DMV source list and voter registration source list and elimination of duplicates.

[15] In that declaration, Plourd essentially restated the language in his June 14 declaration and added the following language: "I have ascertained after my investigation and consultation with qualified demographic experts that there does appear to be a need for significant jury composition related investigation and/or litigation that is necessary to the competent presentation of a capital case in San Diego County. Of particular significance is a up to 50% disparity between the jury eligible population of San Diego County and the number of jurors that are actually available to be summoned by the San Diego System." There is nothing in those statements (or elsewhere in that declaration) specifically alleging the perceived underrepresentation may be caused by the improper merging of the DMV source list and voter registration source list and elimination of duplicates.

prove, or document Defendants' claim, as reflected in their particularized showing, of the underrepresentation that they reasonably believe exists and that is the result of practices of systematic exclusion. (*Jackson, supra,* 13 Cal.4th at p. 1194; *Burgener, supra,* 29 Cal.4th at p. 858; *Horton, supra,* 11 Cal.4th at pp. 1089–1090; *Cummings, supra,* 4 Cal.4th at pp. 1278–1279.)

Although Plourd's supplemental declaration asserts "there is a significant disparity between the number of jury eligible Hispanics and/or African Americans living in San Diego County and the number of Hispanics and/or African Americans who are both called to serve, and those who actually served on juries in San Diego County," that is merely a general and conclusory assertion without any particularized showing, much less an allegation, that perceived underrepresentation may be caused by the improper merging of the DMV source list and voter registration source list and elimination of duplicates. Furthermore, although the declaration also lists five specific factors in support of that general assertion, only the first factor arguably refers or relates to the DMV source list: "1.) The list(s) used to summon jurors underrepresent[s] the Jury eligible minority population of San Diego County." However, as Methvin's testimony and declarations showed, the list used by San Diego County to summon jurors is the master (or merged) list, *not* the DMV source list.

JSI, the third party vendor, merges the DMV and voter registration source lists and then deletes duplicate names, resulting in a master (or merged) list of names used to create summonses for jurors.[16] Therefore, the phrase "list(s) used to summon jurors" in Plourd's supplemental declaration presumably refers to the merged or master list of names used to summon jurors. The trial court has directed Roddy to produce that merged or master list to Defendants, and Roddy does not challenge that part of the court's order (i.e., requiring production of the merged or master list subject to a protective order). (See *Jackson, supra,* 13 Cal.4th at pp. 1194–1195 ["[S]ome of the information sought, such as master lists of jury pools . . . , are judicial records that are or should be available to the public. [Citations.]"].)

Accordingly, as the trial court found, Plourd's supplemental declaration did not support a finding of a particularized showing that Roddy's (or JSI's) practice of merging the DMV and voter registration source lists and deleting duplicate names constitutes an improper practice of systematic exclusion or,

---

[16] Names of persons on the master list who are deceased or permanently or temporarily excused are coded so that they do not receive jury summonses.

for that matter, is improperly performed. As noted above, prior to any testimony of witnesses at the September 5 hearing, the trial court concluded Plourd's August 30 supplemental declaration (and presumably Plourd's two prior declarations), by itself, was conclusory and insufficient to make a particularized showing for discovery.[17]

Furthermore, Defendants' counsel in effect admitted Defendants did not challenge either the practice of merging the two source lists and elimination of duplicate names or the performance by Roddy (or JSI) of that practice. As quoted above, Brown's counsel stated: "I do not contend that the way that the San Diego system actually does the merging [of the source lists] is defective." Therefore, based on Plourd's declarations, we conclude, as the trial court did, that Defendants had not made the requisite particularized showing for discovery of the DMV source list, much less for discovery of any information regarding San Diego County's jury selection process.

To the extent Defendants argue that the testimony of Weeks, the defense demographic expert, cured the deficiencies of Plourd's declarations regarding disclosure of the DMV source list, we are not persuaded. As we noted above, Weeks testified that he understood the master jury list was obtained by merging the DMV and voter registration source lists and then eliminating duplicates. Although Weeks stated he did not know whether that merger and elimination process was done correctly, he in effect conceded (or at least had no basis on which to dispute) that it *was* done correctly because his own calculations showed about 1.8 million persons should be on the merged list after elimination of duplicates, which number was the same Methvin had previously stated was on the merged or master jury list.[18] Weeks was asked: "Were you asked to determine how many people should be on the list of people that is created from the D.M.V. and the voter registration list once it's merged and duplicates are substantially eliminated?" Weeks replied, "Yes." He was asked: "Would that be approximately 1.8 million people?" He replied: "It would be close to that, yes." He then was asked: "So the 1.8

---

[17] Apparently referring to Plourd's August 30 supplemental declaration, the trial court stated in part: "Those are all conclusions and statements on your part. But as I said earlier, your *saying so doesn't make it so.* And I just don't think so far you've presented any evidence to [make], in the language I cited earlier from the case, any particularized showing. [¶] There's a lot of conclusionary language. . . . Well, I don't have any particularized showing I think which raises any reasonable thought in my mind that there . . . will be an unlawful composition of any trial jury in this case."

[18] However, as noted above, Roddy subsequently filed Methvin's supplemental declaration correcting his (Methvin's) previous misstatements that there were about 1.8 million names on the merged list by stating that during the period of January 1, 2005, through September 1, 2006, there were actually about 2.4 million to 2.5 million names on the merged list.

[million] should be what is termed the master jury list where summonses could be sent, is that correct?" He replied, "That's correct." Defendants' counsel later confirmed that aspect of Weeks's testimony in a supplemental memorandum of points and authorities, stating: "[T]he combined list, referred to as the 'Master List' . . . has approximately 1.8 million names of 'prospective Jurors' . . . . Dr. Weeks believes this is approximately the correct number of people that should be on the list." Therefore, rather than showing that Roddy's (or JSI's) practice of merging the DMV and voter registration source lists and deleting duplicate names may have been improperly performed, Weeks's testimony actually supported the contrary finding (i.e., that the list merger and duplicate deletion process had been properly performed).[19] Accordingly, based on the evidence considered by or available to the trial court at the time of its decision on September 13, 2006, or thereafter, we conclude Defendants made no particularized showing that Roddy's (or JSI's) practice of merging the DMV and voter registration source lists and deleting duplicate names constituted an improper practice of systematic exclusion or, for that matter, was improperly performed.[20] Defendants have not established the relevance of the DMV source list to their investigation of a possible unconstitutional jury pool.[21]

---

[19] Although, as noted above, Methvin's supplemental declaration shows the "actual" number of names on the merged list was between 2.4 and 2.5 million names, Defendants did not file any declaration (by Weeks or any other person) in response stating or asserting that the discrepancy between the incorrect former number of 1.8 million names, and the correct "actual" number of 2.4 to 2.5 million names (per Methvin's subsequently filed supplemental declaration) showed Roddy's (or JSI's) practice of merging the DMV and voter registration source lists and deleting duplicate names was improperly performed or the result of an improper practice of systematic exclusion. We refrain from speculating, based on the record in this case, on the reason for Methvin's initial misstatement of the "actual" number *or* Weeks's stated belief that about 1.8 million names should be on the merged list when the "actual" number was 2.4 to 2.5 million names.

[20] Although we do not, in deciding this case, rely on the supplemental declarations of Methvin and Schienbein filed by Roddy in support of his motion for reconsideration of the trial court's order directing him (Roddy) to produce the DMV source list to Defendants, we note that in October 2006 the San Diego County Superior Court apparently changed its procedures for coding permanent and temporary excuses and to exempt persons from jury service if they have served within only the past 12 (rather than the past 18 or 24) months, which changes resulted in an increased jury pool of about 1.2 million persons to whom summonses could be mailed. The recent changes apparently made in the jury selection system would appear to have improved the process that Defendants initially began to investigate.

[21] Based on our understanding of Plourd's declarations and Weeks's testimony, it appears that the problems Defendants perceive may exist in the jury selection system lie not in the process of forming the merged or master jury list, but rather what is done to or with that list (e.g., granting of permanent or temporary excuses, etc.). To that extent, the DMV source list is irrelevant to Defendants' particularized showing and need for discovery of information regarding the jury selection system.

■ Furthermore, statistical disparities, by themselves, are insufficient to show underrepresentation of a cognizable group is the result of unconstitutional systematic exclusion. (*Burgener, supra,* 29 Cal.4th at p. 857.) Therefore, it cannot be reasonably believed, based solely on an apparent statistical disparity between a cognizable group's representation in the community based on census data and other information and its representation in a master jury list, that either a source list (e.g., the DMV source list) or the practices used in forming that master jury list potentially constitute an improper means of jury selection (i.e., a practice of systematic exclusion that causes the perceived underrepresentation). ■ Nevertheless, to the extent Plourd's declarations and Weeks's testimony can be interpreted as asserting the DMV source list, or the San Diego County Superior Court's use of that list, constitutes a potentially improper practice under *Jackson,* that assertion is both conclusory and speculative and does not support either a reasonable belief that the perceived underrepresentation of Hispanics and/or African-Americans in the San Diego County Superior Court's jury pool or venire is the result of improper practices of systematic exclusion *or* is relevant to potentially verify, prove, or document Defendants' claim, as reflected in their particularized showing, of the underrepresentation that they reasonably believe exists and that is the result of practices of systematic exclusion. (*Jackson, supra,* 13 Cal.4th at p. 1194; *Burgener, supra,* at p. 858; *Horton, supra,* 11 Cal.4th at pp. 1089–1090; *Cummings, supra,* 4 Cal.4th at pp. 1278–1279.) Accordingly, the trial court erred by concluding Defendants were entitled to discovery of the DMV source list.[22]

## DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to (1) vacate its October 27, 2006, order directing Roddy or other persons to disclose the DMV source list to Defendants; and (2) issue a new order

---

[22] Because we decide this case based on the ground discussed above, we need not decide the other contentions raised by Roddy, including whether section 197, subdivision (c), absolutely bars him from disclosing the DMV source list to anyone (e.g., even if disclosure is required by a court order) or whether that statute's provisions may not be "trumped" by a criminal defendant's constitutional rights to due process and a fair trial. Furthermore, by granting the OSC (order to show cause) in this matter, we have concluded Defendants' arguments that Roddy cannot obtain the requested writ relief because of a conflict of interest, lack of standing, laches, and/or "unclean hands" are without merit. (Cf. *Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1056 [134 Cal.Rptr.2d 358] [issuance of OSC constituted a determination that petitioner's remedy at law was not adequate].)

sustaining Roddy's objections to Defendants' subpoenas duces tecum to the extent they require disclosure of the DMV source list to Defendants. Our November 20, 2006 stay of the superior court's orders directing Roddy to disclose the DMV source list is vacated. The parties are to bear their own costs in this writ proceeding.

Nares, Acting P. J., and Haller, J., concurred.

A petition for a rehearing was denied June 7, 2007, and the petition of real parties in interest for review by the Supreme Court was denied September 12, 2007, S154226.